(A.R.D. 191)

Nᴀᴛɪᴏɴᴀʟ Cᴀʀʟᴏᴀᴅɪɴɢ Cᴏʀᴘᴏʀᴀᴛɪᴏɴ *v.* Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs

Entry No. 988947.

First Division, Appellate Term

(Decided June 21, 1965)

*Lawrence & Tuttle* (*Edward N. Glad* of counsel); *Barnes, Richarason & Colburn* (*Norman C. Schwartz* and *Hadley S. King* of counsel), associate counsel; for the appellant.

*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the appellee.

Before WILSON and NICHOLS, Judges OLIVER, C.J., not participating.

NICHOLS, Judge: This is an application for review of the decision and judgment of the trial court in Reappraisement Decision 10323, on rehearing of *National Carloading Corporation* v. *United States*, 47 Cust. Ct. 419, Reap. Dec. 10055, affirming the appraisement of the involved merchandise.

The merchandise consists of four series of Lodge spark plugs, manufactured by Lodge Plugs, Ltd., of Rugby, England, and imported into this country by Lodge Spark Plug Co. of Los Angeles in May 1959. The spark plugs were invoiced, entered, and appraised as follows:

|  | Invoiced and entered | Appraised |
| --- | --- | --- |
| Standard spark plugs | $0.20 | £0–2–1.42 |
| Platinum spark plugs | 1.05 | £0–7–4.91 |
| Silver spark plugs | 0.25 | £0–2–5.90 |
| Racing spark plugs | 0.75 | £0–5–5.45 |
|  | each, plus packing | each, plus cost of cases |

Appraisement was made [1] on the basis of foreign value under the provisions of section 402a(c) of the Tariff Act of 1930, as amended (the old valuation section).

The appellant, plaintiff below, contends that the proper basis of appraisement is export value, defined in section 402(b) of the Tariff Act of 1930, as amended (the new valuation section), and that the invoiced and entered values are the proper unit values for the imported merchandise.

The appellee, the defendant below, contends that the appraised values are the proper values for this merchandise.

At the first hearing below, the court held that, although the involved merchandise was not included on the final list of articles to be valued under the old law and, therefore, the appraiser's valuation was erroneous, the importer had failed to maintain its burden of proof in establishing some other correct value so that, by operation of 28 U.S.C., section 2633, the appraised values would stand. Thereafter,

---

[1] While the basis of appraisement was initially in doubt at the first hearing, both parties agree now that foreign value was the appraised value.

the court granted appellant's motion for rehearing in order that appellant be given the opportunity to furnish additional evidence in an attempt to establish export value under the new valuation section as the proper basis of appraisement.

On rehearing before a different judge sitting as the trial court in this reappraisement proceeding, the findings and conclusions of the first hearing were maintained and the appraised values of the merchandise were upheld.

The case comes before this court for a review of all the facts and issues litigated below. The questions presented for determination are separable and distinct, namely, (1) is the imported merchandise subject to appraisement under the old valuation section? and if not, (2) has export value been established under the new valuation section by competent and substantial evidence? Although the questions are distinct, the court's conclusions as to the first question may or may not render treatment of the second question necessary. Without referring individually to each ground for appeal, as stated in appellant's application for review, our treatment of the main issues will consider and dispose of them all.

The issue as to whether the merchandise at bar is to be appraised under the old (alternative) valuation section or under the new valuation section emanates from the appraiser's determination that the involved spark plugs are included on the final list, published by the Secretary of the Treasury in 93 Treas. Dec. 14, 40, T.D. 54521, under the listing for "Automobile parts, finished."

Appellant argues that spark plugs are not to be included on the final list, since the identical merchandise was held to be classifiable as parts of internal-combustion engines of the carburetor type rather than as automobile parts in *Lodge Spark Plug Co., Inc., and James Loudon et al.* v. *United States*, 44 Cust. Ct. 448, Abstract 64136. There is no provision for parts of internal-combustion engines of the carburetor type on the final list.

The trial court, in Reap. Dec. 10055, after observing the terminology of the automobile parts provision in paragraph 369(c), Tariff Act of 1930, concluded as follows:

* * * Therefore, where the same words are used in the final list, to describe articles or classes of articles, as are used in the tariff act, they have the same meaning. Any other construction would lead to confusion, rather than the simplification intended by the amendatory statute. Therefore, the construction of the words "automobile parts" in a classification case is relevant to the construction of the same words or similar phraseology in an appraisement proceeding.

This conclusion was adopted by the court on rehearing (Reap. Dec. 10323) with the additional finding that the term "automobile parts"

has the same meaning wherever found in the tariff act and amendments thereto.

It is appellee's contention that the term "Automoble parts, finished," as used by the Secretary of the Treasury in formulating the final list is not controlled by or in any way affected by the tariff provision for automobile parts and the classification cases interpreting that provision. In its brief, the Government cites several cases for the proposition that words used in different sections of a statute will not necessarily be construed to possess the same meaning. Furthermore, appellee argues, the duties and functions of the appraiser and the collector are clearly separable, and the classification of merchandise bears no relevance to the appraiser's determination of value. Questions of chief use or dedication to use are for the collector and do not enter into the appraiser's calculation of value. Therefore, the argument concludes, since spark plugs are indisputedly used on automobiles, appellant has failed to establish by any competent evidence that the Secretary did not intend to include the importation at bar on the final list as parts of automobiles.

In determining the meaning of the words "Automobile parts, finished," as they appear on the final list, the starting point is the ascertainment of legislative intent, including, in this case, the intent of the official to whom legislative authority was delegated. The primary source of intent is section 6(a) of the Customs Simplification Act of 1956, Public Law 927 of August 2, 1956, which embodies the Legislative scheme for the creation of the final list. Section 6(a) reads as follows:

SEC. 6. (a) The Secretary of the Treasury shall determine and make public a list of the articles which shall be valued in accordance with section 402a, Tariff Act of 1930, as amended by this Act, as follows:

As soon as practicable after the enactment of this Act the Secretary shall make public a preliminary list of the imported articles which he shall have determined, after such investigation as he deems necessary, would have been appraised in accordance with section 402 of the Tariff Act of 1930, as amended by this Act, at average values for each article which are 95 (or less) per centum of the average values at which such article was actually appraised during the fiscal year 1954. If within sixty days after the publication of such preliminary list any manufacturer, producer, or wholesaler in the United States presents to the Secretary his reason for belief that any imported articles not specified in such list and like or similar to articles manufactured, produced, or sold at wholesale by him would have been appraised in accordance with such section 402 at average values which are 95 (or less) per centum of the average values at which they were or would have been appraised under section 402a, Tariff Act of 1930, as amended by this Act, the Secretary shall cause such investigation of the matter to be made as he deems necessary. If in the opinion of the Secretary the reason for belief is substantiated by the investigation, the articles involved shall be added to the preliminary list and such list, including any additions so made thereto, shall be published as a final list. Every article so specified in the final

list which is entered, or withdrawn from warehouse, for consumption on or after the thirtieth day following the date of publication of the final list shall be appraised in accordance with the provisions of section 402a, Tariff Act of 1930, as amended by this Act.

It appears that the final list is composed of articles upon which the Secretary of the Treasury (hereinafter referred to as the Secretary) has determined that a 5 percent or more decrease in value would occur, based on 1954 appraisal figures, if such articles were subject to appraisement under the new valuation law. It will be noted that section 6(a) speaks of "each article" and "such article" in the singular, whereas "parts of automobiles," as the trial court pointed out in Reap. Dec. 10055, is a class of articles. Moreover, even a quick search of the final list indicates that the listings thereon range in scope from single commodity items all the way to "basket" or class provisions. Such diversity in the expression of the word "article," [2] together with the rival contentions as to the applicability of classification principles to the term "Automobile parts, finished," as used by the Secretary on the final list, poses sufficient ambiguity of meaning to sustain the use of legislative history. In any event, explanation of the precise issue before the court will be aided thereby.

As stated in House Report No. 858, 84th Congress, 1st session, June 18, 1955, the Customs Simplification Act grew out of a study conducted through the auspices of the Treasury Department with funds appropriated by Congress in 1948 for a survey of the customs service. The purpose of H.R. 6040, which eventually became the Customs Simplification Act of 1956, was to simplify customs procedures in order to bring about greater speed and increased certainty in the handling and processing of imported merchandise and to obtain more commercial realism in the language of our customs laws.

The principal feature of H.R. 6040 is contained in section 2 which establishes "export value" as the single preferred standard of valuation. Although H.R. 6040 passed the House intact, opponents of the bill in the Senate raised the following objection, reported in Senate Report No. 2560, July 13, 1956, 84th Congress, 2d session:

* * * (1) that the abolishment of foreign value would result in lower dutiable values on items dutiable on an ad valorem (percentage of the value) basis and thereby would reduce the amount of protection on similar items made in the United States, * * *.

The Senate report, *supra*, reveals that the concern shown for possible loss of protection resulted in the Treasury Department conducting a survey to examine the accuracy of such concern. These events led directly to the adoption, by the Senate Finance Committee, of

---

[2] The court is aware that the word "article" can have more than one meaning, depending on the context in which it is used. *D. N. & E. Walter & Co. et al.* v. *United States,* 44 CCPA 144, 147, C.A.D. 652. However, the context of sec. 6(a) is not sufficiently revealing.

amendments to H.R. 6040 which, in final form, became section 6(a) of the Customs Simplification Act.

The amendment incorporating the present language of section 6(a), containing one variation which was subsequently deleted and which will be mentioned below, was introduced by the Chairman of the Senate Finance Committee, Senator Harry F. Byrd, at the request of the Treasury Department as appears in the Hearings Before the Committee on Finance, United States Senate, 84th Congress, 2d session, June 25, 26, and 27, 1956. The chief witness on behalf of the Treasury Department was the Honorable H. Chapman Rose, who recently had been Under Secretary of the Treasury. Mr. Rose's role in these matters was described at the hearings by the Honorable David W. Kendall, Assistant Secretary of the Treasury:

The drafting of H.R. 6040, and the proposed amendment particularly, and the preparation of the Treasury material in support of its enactment had all been completed or undertaken under Mr. Rose's direction before he left the Treasury, as you know. Consequently, nobody is in a better position to express the administration view on this important part of the President's foreign economic program.

After testifying about the need, purpose, and effect of the new law and the background and determinations entering into the proposed amendment of that law by section 6(a), there ensued the following exchange of questions and answers which sheds considerable light on the very issue before this court. The questions were submitted to Mr. Rose by Senator Byrd:

Question. Under the present law, which would be continued with a number of modifications under your proposed new section 402, ad valorem duties are imposed on the specific "merchandise undergoing appraisement," on the basis of its value in the principal markets of the country of exportation. However, under your proposed section 402a, as I understand it, ad valorem duties would be computed not on the "merchandise" but on "articles" and not on the value "in the principal markets of the country of exportation," but on the "average value" of all appraisements actually made of that "article" in fiscal 1954, regardless of sources or time of importation. Now, if my understanding is correct, I should like to ask you: Why do you propose to recompute the value of merchandise appraised in fiscal 1954 on the basis of "articles" rather than "merchandise"?

Answer. In order to accomplish the maximum amount of protection against decreases of 5 percent or more, with the maximum amount of simplification where such decreases in value do not occur, it is necessary to have considerable discretion in describing the listed items. It is for this reason that the term "article," which is not a word of art in the Tariff Act, was used to describe the listings to be made. After listing, each importation on the list would be appraised in exactly the same manner that appraisal now takes place, i.e., on the value of the merchandise in the applicable principal markets.

Question. The proposed amendments speak of "average value," but give no indication as to what this is or how it is to be determined. How would the "average value" of a specific product be determined under section 402a?

Answer. Once the appropriate grouping for a product has been determined, the average decrease in value will be determined by a simple arithmetical calculation of the average value before and after amendment of the items in the article.

Question. I find no definition of "article" in the Tariff Act or the proposed amendments which would be applicable to section 402a. How would the Secretary distinguish one "article" from another?

Answer. I gave the general approach which would be followed in my prepared statement in which I said: "In formulating these lists, every effort would be made to describe the commodities with such particularity that any import item which would be reduced in value by 5 percent or more under the new procedures would continue to be subject to the old valuation principles." One imported article would be distinguished from another to the extent necessary to accomplish this purpose. The Treasury would not propose to group together all products as one "article" merely because they are so grouped by the Bureau of the Census for statistical purposes. On the other hand, the Bureau of the Census groupings might be used wherever they accomplished that purpose. If it appeared that some imports in a particular schedule A grouping decreased in value by more than 5 percent, although the average value of the whole group decreased by less than 5 percent, it would be the intention to describe the items which decrease by 5 percent or more as an article for the purpose of having the old valuation principles applied to them.

Question. Would the meaning to be attributed to the word "article" be left entirely to the discretion of the Secretary?

Answer. As stated above, we believe that discretion in determing [sic] the "articles" for listing is needed to obtain the greatest possible protection against decreases in value of 5 percent or more, coupled with the maximum amount of simplification possible.

Question. How would a distinction be drawn between two chemical compounds having the same active ingredients but in different proportions?

Answer. If it is necessary to accomplish the purpose of not permitting a decrease of 5 percent or more in valuation during the trial period, similar chemical compounds will be distinguished as will other related types of imported merchandise.

Question. How about two similar chemical compounds which are closely related but have different formula?

Answer. If one such compound decreased in value by 5 percent or more and the other didn't, the 5 percent decrease compound would be separately listed. If both changed by less than 5 percent or by 5 percent or more, they would not be distinguished.

Of particular significance is the answer given to the third question, namely, the meaning of the word "article" as it applies to the makeup of the final list. Individual articles of importation were investigated and not simply groups or classes of articles. While the term "article" is used on the final list to indicate a whole group of imported items as well as to describe only a single import item when necessary, each imported item for the year 1954 was subjected to a comparative value finding. Such value findings, however, were not particularized by

country of exportation or determined by the individual marketing practices found in one country but included an average valuing for the item and, when listed, it pertains to the importation of that item from all countries.

Imported articles were to be distinguished one from the other to to the extent necessary to carry out the declared intent to list every import item which would be reduced in value by the 5 percent figure. This avowed intent was coupled with the effort to achieve maximum simplification where such decreases in value did not occur. In order to obtain both objectives, discretion in describing the scope of listed items was necessary. In reply to the last-quoted question, the response indicates that where two imported chemical products were both subject to a 5 percent or greater decrease, the listing would not attempt to distinguish between them. There is no basis to suppose that the same rule does not have application to other listings as well.

Moreover, the concern for adequate protection against decreases in dutiable values was directed toward the effect on particular articles and not simply an average effect on a whole series of articles. This approach to the problem of safeguarding against significant decreases in protection is often repeated throughout the legislative course of section 6(a) and is illustrated by this exchange between Senator Williams of Delaware and Mr. Rose, page 28, Hearing Before the Committee on Finance, *supra*:

Senator WILLIAMS. Do you think that the limitation of 5 per cent that was written in the amendment will prove to be a handicap in the simplification procedures, objectives?

Mr. ROSE. Well, from the standpoint purely of simplification it isn't as much simplification as if the new method were applied to everything. On the other hand, so much concern has been expressed about the effect—not the average effect, I think, but the effect on particular commodities that might be affected radically more than the average—* * *.

A further fact concerning the legislative history of section 6(a) deserves mentioning. The language of section 6(a) was adopted as proposed by the Treasury Department with one important variation. The original proposal for section 6(a) called for an additional investigation 1 year after the publication of the list of articles to be valued under the old valuation law. The additional investigation would determine whether the original list of articles should be decreased or increased due to changes in circumstances occurring since the date of publication of the first list. Such redetermination would take place at 1-year intervals for a period of 4 years, at the end of which time all articles would be subject to the new valuation law, unless Congress acted to make the fourth and final list permanent. As noted in Senate Report No. 2560, *supra*, the Treasury Department's research indicated that less than 10 percent of ad valorem items would be on the original

final list. It was developed at the Senate Finance Committee Hearings, *supra*, that because of changing marketing practices employed by foreign producers the fourth and final list was expected to be of minimal proportions.

However, by floor amendment to the Committee's amendment, the additional lists were eliminated from the final form of section 6(a) as approved and enacted into law by Congress. The provision for additional lists was dropped for several reasons. It was thought that such a provision would add too much additional discretionary authority to the Secretary since the investigations resulting in the makeup of the lists were not subject to hearing, review, or appeal. (102 Cong. Rec. 13879.) Also, objection was voiced concerning the confusion resulting from subsequent variations in the final list, as expressed in the Minority Report to Senate Report No. 2560, 3 United States Code Congressional and Administrative News, 84th Congress, 2d session, page 4190.

Furthermore, the lists would not necessarily carry the same items year after year. Items appearing on the list are to be appraised under the present value standards while those not listed would be appraised under the rules provided in the amended bill. This on-again, off-again character of the lists would create considerable confusion abroad as to the amount of duties to which imported articles would be subject during the 4-year period involved.

The amendment to the Customs Simplification Act, as discussed above, was originated and sponsored in the Senate by Senator Byrd of Virginia, while the research and drafting was performed by the Treasury Department. It is recognized that the statements of sponsors and those in charge of guiding legislation through to passage are among the most reliable and authoritative indicia of legislative intent and may be used to clarify ambiguous statutory language or as explanatory data concerning the particular issue before the court. *H. W. Robinson Air Freight Corp.* v. *United States*, 45 Cust. Ct. 102, C.D. 2207, reversed on other grounds 48 CCPA 148, C.A.D. 782.

From the foregoing, we conclude the following: (a) The term "article," as used in the context of section 6(a), describes in some instances individual imported items of commerce and in other instances groups of imported items; (b) the Secretary had the discretion to list items individually, in combination, or by class or group; and (c) if an inclusive term was used, covering two or more different items or articles of commerce, it is to be presumed that each and every item or article covered had come under the Secretary's study, and no intent to cover any article unknown, or to have the scope of the list altered by subsequent classification decisions, could have existed. This is very different from the intention manifested by Congress in enacting the tariff schedules. There, the intent was to leave nothing out that was not expressly designated on the free

list; articles might be designated *eo nomine* that were unknown to Congress or not extant. *United States* v. *Geo. Wm. Rueff, Inc.*, 41 CCPA 95, C.A.D. 535; *Davies Turner & Co.* v. *United States*, 45 CCPA 39, C.A.D. 669. The legislative intent is the "lodestar" which must override mechanical rules of interpretation. *United States* v. *American Import Co.*, 26 CCPA 283, C.A.D. 28; *James F. White & Co.* v. *United States*, 23 CCPA 224, T.D. 48061. If the context requires, the same language repeated in different tariff paragraphs will receive different interpretation. *Bluefries New York, Inc.* v. *United States*, 40 Cust. Ct. 395, C.D. 2010. And our appellate court has recently held that the word "similar" in American selling price provisions, section 336, Tariff Act of 1930, and in T.D. 46158 is not to be construed according to interpretations of the word "similar," as found in other clauses of the tariff act, where the context and circumstances require a different approach. *Albert F. Maurer Co.* v. *United States*, 51 CCPA 114, C.A.D. 845. Realizing this as we do, we conclude further that insofar as tariff classification is a guide in construing list items, it is the classification practice that prevailed when the list was published. The Secretary had discretion how to use terminology to indicate the scope of each group provision, and reliance was placed on the commodity listings in schedule A, Bureau of Census, wherever feasible. Where questions arise as to construction of individual words or phrases used in the group terminology, then existing, definitions or judicial constructions of such or similar language are available as independent means of clarification.

However, the meaning of the item must remain its meaning as of January 1958. Later authorities may be considered only if they can be supposed to reflect practice as of that date. This is not the case when a court decision of a later date sharply reverses a practice that prevailed on the controlling date.

There is good reason to think that the Secretary intended to enumerate spark plugs as parts of automobiles. Bureau of Census import statistics show that, in 1952 and 1953, spark plugs were enumerated statistically as a subheading under automoble parts. In 1954 and later, they were lumped with other automobile parts, for which the appropriate heading reads:

> Automobiles 7902 900 Parts of, except tires,
> inner tubes, and glass (include
> spark plugs), (formerly 7902 500).

We notice these publications, as is held proper in *Van Gelder-Fanto Corp.* v. *United States*, 41 CCPA 90, C.A.D. 534.

The Bureau of Census reports reflect the customs treatment of the articles listed, and, in 1958, the practice cannot but have been established and uniform, to classify spark plugs as auto parts. We have

no record of any protest pending against such practice on January 20, 1958, the date of publication of the final list. Numerous protests were filed later that year, showing how widespread the practice was. In fulfillment of the Secretary's obligations under section 502, Tariff Act of 1930, we must presume he disseminated information of this practice to all ports. Spark plugs were important articles of import trade. The protests, when they came, were reviewed and the practice adhered to. The Government defended it before this court, erroneously as the outcome showed, but undoubtedly in all good faith.

Despite the argument now made for the Government, it would have been strange if, in 1958, the Secretary had not used words in the list in conformity with the the then unchallenged practice of his own department. He said the listing includes "some deviations from existing principles of tariff classification." These words perhaps cut both ways in the present controversy. Presumably, a then-existing "principle" was that auto parts included spark plugs. Had he intended to deviate from it, however, he would have used further words to show this. Where he did deviate, he expressed it. Thus a deviation occurs in that "unfinished" articles, classified as parts of automobiles for classification purposes, are not to be so regarded for final list purposes.

Concluding, then, as we do, that the Secretary intended to place spark plugs on the final list as auto parts, the next question is, did the Secretary use words that were adequate to place spark plugs on the final list, according to the understanding of those who would read the list? There can be no doubt that the Secretary did publish an announcement which would have been understood as stating that spark plugs were on the final list. None of the reasons we have invoked, to determine the Secretary's intent, were locked in his own breast or in those of his aides. All were matters of public knowledge and record. Therefore, all were or could have been just as well known to customhouse brokers, importers, attorneys, and agents as to anybody. To any reasonable person, in 1958, interested in the import trade in spark plugs, the words on the final list "Automobile parts, finished," either denoted spark plugs among other things, or at least put him on notice that the Secretary might so intend.

If the Secretary intended to designate spark plugs, and if what he published was so understandable at the time, this court is not going to be led off into any tangential inquiry as to whether he used the right magic words. However, we may regret that the Secretary did not provide more effective guides to his intent at the time.

The lower court, by holding that the scope of articles on the final list must be determined by a 1960 classification decision construing the same or similar language as found in the dutiable provisions of the tariff act, effectively divorced the language of the final list from the

value determinations envisioned by section 6(a). The question in this case, whether spark plugs were notified as included on the final list as published on January 20, 1958, and made effective for imported merchandise on February 27, 1958, is in no way properly affected by a subsequent decision changing the administrative classification of those articles. If spark plugs were, as we hold, included on the final list when published, they were put there as a result of an examination of their appraised figures for 1954 under both the old and new valuation formulae. Such an examination took into account factors of price, marketing procedures, and the like.

Moreover, by adopting the final amendment to section 6(a), the Congress intended to preclude subsequent variations in final list content even if based on further value investigations. It is reasonable to say that an interpretation of the final list that would effect a modification of the articles so listed based solely on subsequent changes in classification practice is *a fortiori* prohibited. This is equally true whether that subsequent classification decision would, if followed, result in deletions or additions to the final list. (*Cf. Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849, holding auxiliary heaters as parts of automobiles.)

The technique of interpretation employed by the trial court herein reduces to subordinate status the ascertainment of the legislative intent, which ought to be the primary concern of a court when it has to construe a statute, or a rule issued by the executive branch under authority of a statute. Instead, it gives certain words certain consequences regardless of the user's intent. A continued use of such technique would not only, as here, subtract from the list items intended, after investigation, to be on it. It would also add items to the list where no investigation was had, or investigation conclusively established that the items should not be on the list.

The view taken by the court below would likewise seem to make more difficult the adjudication of classification issues. Instead of concentrating its attention on the protest, the contentions of the parties, the evidence adduced by them, and their briefs, the court would constantly have to bear in mind it might be adjudicating the rights of persons not before it. It would have to speculate what they might say if heard, and what evidence they might offer. Parties might claim the right to intervene, or at least to file briefs *amicus*. We believe this court can function most effectively if it concentrates its attention on the controversies before it at the time for adjudication, but this cannot be done if adjudication of the meaning of a word in context A is going to be held, in the name of "simplification," to be binding in contexts B, C, and D. We may add there is nothing in the *Lodge* classification case, *supra*, to show that the court there considered it was deciding a "final list" question.

We do not wish to be understood as fully endorsing the argument of the Government in its brief: "The functions of the collector have no bearing upon the duties of the appraiser" (p. 14). This argument overlooks the action of President Truman in Reorganization Plan No. 26 of 1950, 64 Stat. 1280, in transferring statutory authority of all Treasury officials to the Secretary. The intent, of course, was to establish unity of command. Reorganization Plan No. 1 of 1965 reaffirms this action and makes it applicable to any new statutory functions of customs employees created since 1950. We think the problem posed by this case can be solved without placing any dependence on the continuation of disunity in the customs service.

Nor do we agree that the appraiser's determination must be sustained, in the absence of "any competent evidence that the Secretary of the Treasury did not intend to include the importation at bar * * *." (Government brief, p. 18.) This smacks of saying that the final list means whatever the now Secretary says it means, and nullifies the expectation of the Congress that decisions interpreting the list, along with other decisions of appraisers, would be subject to judicial review. House Report No. 858, 84th Congress, 1st session, page 6. What the Secretary of 1958 intended to put in the list must be determined according to established canons of statutory construction, as we have attempted to do, not according to what the successor Secretary and his department now say.

Mention should be made here of the 1961 decision in *A. H. Deringer, Inc.* v. *United States*, 46 Cust. Ct. 606, Reap. Dec. 9927, relied upon by the trial court in Reap. Dec. 10055. While this court is not bound to follow that decision in any case, *cf. H. W. Robinson Air Freight Corp.* v. *United States*, *supra*, the holding in no way conflicts with the findings reached here. The case involved the importation of certain pulpboard from Canada in March 1959. The issue was conceded after trial and, therefore, does not stand, strictly speaking, as a precedent respecting the judicial construction of the final list. Nevertheless, in reaching its decision that the merchandise was not specified on the final list, the court relied on authority for the common and commercial meaning of words used within the Secretary's group listing which antedated publication of the list and presumably would have guided the preparation of it.

Because of our determination that the involved merchandise is on the final list of articles to be valued under the old valuation section, we need not consider the question of export value under the new law.

We find as facts:

1. That the merchandise involved herein consists of four series of so-called Lodge spark plugs, imported from England, and entered for consumption on May 12, 1959.

2. That the merchandise was appraised on the basis of its foreign value, as defined in section 402a(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. That the said spark plugs are included on the final list, published by the Secretary of the Treasury pursuant to section 6(a) of the Customs Simplification Act of 1956, under the provision for "Automobile parts, finished."

We conclude as matters of law:

1. That the scope of the provision for "Automobile parts, finished," appearing on the final list of articles published by the Secretary of the Treasury pursuant to section 6(a) of the Customs Simplification Act of 1956, is to be determined as of the date of publication of said list.

2. That the merchandise involved herein, being included in the final list of articles so published, is properly appraised in accordance with the provisions of section 402a(c) of the Tariff Act of 1930, as amended.

3. That since the plaintiff has failed to prove otherwise, the values for the respective items of merchandise are as found by the appraiser.

The judgment of the trial court is affirmed.

Judgment will be rendered accordingly.