(R.D. 11719)

ESTEE CANDY CO., INC., v. UNITED STATES

Entry No. 1006765.

(Decided August 4, 1970)

*Sharretts, Paley, Carter & Blauvelt* (*Charles P. Deem* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Arthur H. Steinberg* and *Bernard J. Babb*, trial attorneys), for the defendant.

RICHARDSON, Judge: The merchandise of this reappraisement appeal consists of dietetic vanilla and chocolate flavored wafers exported from Holland on or about March 26, 1965. It appears that upon entry the merchandise was appraised on the basis of United States value as defined in 19 U.S.C.A., § 1402(e) (section 402a(e), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956)—the appraiser concluding that the involved merchandise was on the final list promulgated by the Secretary of the Treasury under T.D. 54521. Plaintiff-importer contends that the imported wafers at bar are not on the Secretary's final list, and that said merchandise should be appraised on the basis of export value as defined in 19 U.S.C.A., § 1401a (b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956), represented herein by the invoice c.i.f. prices, less non-dutiable invoiced sea freight and marine insurance charges.

The record in this case consists of the invoice and entry papers, a sample of the domestic variety of dietetic wafer marketed by plaintiff (exhibit 2), a sample of the dietetic wafer imported by plaintiff (illustrative exhibit 3), the testimony of four witnesses called on plaintiff's behalf and invoices covering sales of the imported dietetic wafers to purchasers in Norway and Sweden by the exporter herein (exhibits 4 and 5), and, at the instance of the defendant, a stipulation that matzo crackers (exhibit A) and water biscuits (exhibit B) were imported into the United States during the fiscal year 1954. Also in

the record are rulings in letter form of the Deputy Commissioner of Customs relative to the inclusion of the imported dietetic wafers on the final list promulgated by the Secretary of the Treasury in T.D. 54521 (collective exhibit 1).

On the matter of the final list promulgated by the Secretary of the Treasury in T.D. 54521, to which the court first addresses itself, the provisions of section 6(a) of the Customs Simplification Act of 1956 read as follows:

> Sec. 6(a). The Secretary of the Treasury shall determine and make public a list of the articles which shall be valued in accordance with section 402a, Tariff Act of 1930, as amended by this Act, as follows:

> As soon as practicable after the enactment of this Act the Secretary shall make public a preliminary list of the imported articles which he shall have determined, after such investigation as he deems necessary, would have been appraised in accordance with section 402 of the Tariff Act of 1930, as amended by this Act, at average values for each article which are 95 (or less) per centum of the average values at which such article was actually appraised during the fiscal year 1954. If within sixty days after the publication of such preliminary list any manufacturer, producer, or wholesaler in the United States presents to the Secretary his reason for belief that any imported articles not specified in such list and like or similar to articles manufactured, produced, or sold at wholesale by him would have been appraised in accordance with such section 402 at average values which are 95 (or less) per centum of the average values at which they were or would have been appraised under section 402a, Tariff Act of 1930, as amended by this Act, the Secretary shall cause such investigation of the matter to be made as he deems necessary. If in the opinion of the Secretary the reason for belief is substantiated by the investigation, the articles involved shall be added to the preliminary list and such list, including any additions so made thereto, shall be published as a final list. Every article so specified in the final list which is entered, or withdrawn from warehouse, for consumption on or after the thirtieth day following the date of publication of the final list shall be appraised in accordance with the provisions of section 402a, Tariff Act of 1930, as amended by this Act.

The Customs Simplification Act of 1956, which became chapter 887 of Public Law 927, 84th Congress, was approved August 2, 1956 [70 Stat. 943]. The "preliminary list" provided for in section 6(a) of said Act was promulgated by the Secretary of the Treasury in the Federal Register on August 23, 1957 (22 F.R. 6842) and the "final list" on January 28, 1958 (23 F.R. 539). And by virtue of sections 6(a) and 8 of said Act the old and new valuation provisions thereof became effective on February 27, 1958.

The Deputy Commissioner of Customs, in responding to a request for a ruling on whether dietetic wafers such as those at bar were on

the Secretary's final list, concluded that they were on said final list. The rationale of the Commissioner's ruling is as follows (collective exhibit 1):

> A review of the background files upon which this listing was based discloses that a wide assortment of biscuits, wafers, cakes and other baked articles were considered. The term was considered in its broadest sense without any limitation. The only items excluded are puddings and rice crackers which are exempted specifically by the language of this listing.
>
> Therefore, it is the opinion of the Bureau that dietetic articles in the form of biscuits and wafers are within the Final List description heretofore mentioned and subject to appraisement under section 402a, notwithstanding that these identical articles may not have been manufactured or imported during fiscal year 1954.

The "listing" to which reference is made in the Commissioner's ruling is the description of articles set forth in the "preliminary list" as follows (T.D. 54521):

AGRICULTURAL PRODUCTS AND PROVISIONS

Baked Articles
> Biscuits, cake, cakes, wafers, and similar baked articles other than puddings or rice crackers; all the foregoing by whatever name known, whether or not containing chocolate, fruits, nuts, or confectionery of any kind.

Plaintiff contends here that the aforementioned description does not embrace the merchandise at bar because said description covers only merchandise appraised during the fiscal year 1954, and that the involved dietetic wafers were not imported in or prior to 1954, and hence, were not appraised during fiscal 1954. Defendant, on the other hand, contends that the involved wafers come within the description of a group of articles which were appraised in 1954, and hence, are embraced by such description in the final list, notwithstanding the fact that the imported article at bar was not imported in or prior to 1954.

The preliminary list, together with the additions thereto provided for in section 6(a) [identified in T.D. 54521 by an asterisk] comprises the final list of articles subject to appraisement pursuant to section 402a of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

In connection with the interpretation of final list application both parties have called the court's attention to the cases of *National Carloading Corporation* v. *United States*, 55 Cust. Ct. 723, A.R.D. 191 (1965), and *Ciba Company, Inc.* v. *United States*, 54 Cust. Ct. 797, A.R.D. 187, 243 F. Supp. 394 (1965), among other cases. The *National Carloading* case involved the question of whether spark plugs (which appear to have been imported and appraised in 1954) were

enumerated on the "final list" via the preliminary list designation for "automobile parts, finished". In that case the Appellate Term reviewed the legislative history of section 6(a) and upheld the trial court's decision that spark plugs were within such "final list" designation, although on different grounds. In reaching such conclusion the Appellate Term stated, among other things (pp. 729-730):

. . . Individual articles of importation were investigated and not simply groups or classes of articles. While the term "article" is used on the final list to indicate a whole group of imported items as well as to describe only a single import item when necessary, each imported item for the year 1954 was subjected to a comparative value finding. Such value findings, however, were not particularized by country of exportation or determined by the individual marketing practices found in one country but included an average valuing for the item and, when listed, it pertains to the importation of that item from all countries.

And again the Appellate Term stated, in this connection (p. 731):

From the foregoing, we conclude the following: (a) The term "article," as used in the context of section 6(a), describes in some instances individual imported items of commerce and in other instances groups of imported items; (b) the Secretary had the discretion to list items individually, in combination, or by class or group; and (c) if an inclusive term was used, covering two or more different items or articles of commerce, it is to be presumed that each and every item or article covered had come under the Secretary's study, and no intent to cover any article unknown, or to have the scope of the list altered by subsequent classification decisions, could have existed. . . .

The decision of the Appellate Term in A.R.D. 191 was reversed by our appeals court in *Id.* v. *Id.*, 53 CCPA 57, C.A.D. 877 (1966), on grounds not involving a consideration of the Appellate Term's reasoning with respect to the word "article" above noted. The Court of Customs and Patent Appeals, citing its own decision in *United States* v. *Ford Motor Co.*, 51 CCPA 22, C.A.D. 831 (1963), appears to have concluded as a matter of law that spark plugs did not come within the final list designation of "automobile parts, finished", but came, instead, within the tariff provision for parts of internal combustion engines—a category not enumerated on the final list.

In the *Ciba* case the court held that a coal tar dye, known as "Neolan Flavine GFE 24%", was legally added to the "final list" by the Secretary of the Treasury although this item was not imported or appraised during the fiscal year 1954. The Appellate Term held the item to be properly on the "final list" after reviewing the decision of the reappraising court in *Ciba Company, Inc.* v. *United States*, 50 Cust. Ct. 493, Reap. Dec. 10532 (1963), which involved the "final list" status of a coal tar dye known as "Deorlene Brilliant Red

R", and in which case the legislative history of section 6(a) was extensively reviewed by the trial court.

The coal tar dye involved was not on the preliminary list, but resulted from an investigation by the Secretary of the Treasury following action by a domestic manufacturer, producer or wholesaler, and was therefore governed by the language of the latter part of section 6(a). The court thus recognized the import of the language of the first part of section 6(a) as being applicable to an article becoming a part of the final list via the preliminary list—"at which such article was actually appraised during the fiscal year 1954."

While neither of the aforementioned cases cited to the court by the parties herein dealt with the precise facts now before the court, the court finds the discussion of the legislative history of section 6(a) contained therein to be helpful in arriving at a decision on the question raised here. On the basis of such discussion of legislative history and from the court's own reading of section 6(a), the court is of the opinion that the articles contained on the "final list" are limited only to articles which were actually imported prior to promulgation of the list. The court is further of the opinion that articles appearing on the final list by way of the preliminary list are limited to articles appraised in the fiscal year 1954, and that articles on the final list by virtue of the supplemental listing are limited to articles actually imported, although not necessarily appraised prior to the expiration of 60 days following the publication of the preliminary list on August 23, 1957. See: Conference Report No. 2866 on H.R. 6040, 84th Congress, Second Session, 1956, *U.S. Code Congressional and Administrative News* Vol. 3, p. 4191.

It is clear to the court that the articles intended to be listed by the Secretary of the Treasury in T.D. 54521 were only those articles experiencing a decline in dutiable values over a period of time under scrutiny by customs officials. And it was to stem the tide of this decline in values that the "final list" was evolved with a view toward the preservation of "optimum" levels of value as to merchandise undergoing such experience of diminishing value. Obviously then, such state of affairs could only relate to identifiable, tangible merchandise concerning which a basis for comparison of values existed. And there could not conceivably be any occasion at this time for focusing attention on non-existent merchandise, i.e., merchandise not imported until years after. Thus, it is that references in section 6(a) to the structuring of both categories of articles (preliminary and supplemental lists) are pivoted around the *importation* of merchandise.

Since wafers are on the final list by way of the preliminary list, plaintiff need only show that the involved wafers were not appraised in fiscal year 1954. On the basis of the evidence adduced in this

record the court is of the opinion that plaintiff has made a *prima facie* showing that the involved wafers were not appraised during fiscal 1954. Charles H. Adler, chairman of the board of the plaintiff-importer, after testifying to extensive business travel and customer contact during a period beginning several years prior and extending for several years subsequent to fiscal 1954, testified that during fiscal 1954 no instance of the marketing in the United States of imported dietetic wafers had come to his attention, and that no one but his company had, to his knowledge, imported dietetic wafers (R. 16–17). Mr. Adler also testified, among other things, that a dietetic sugar wafer is similar to a normal sugar wafer except that it is made without any sugar, that its ingredients differ from those of a sugar wafer, and that its costs is about twice that of a sugar wafer (R. 8–9), and that the importation of the involved dietetic wafer results from an agreement between his company and the foreign exporter, Victoria Export of Holland in 1961, under which this merchandise was manufactured by Victoria for the plaintiff (R. 15).

Simon Bestebreurtje, export sales director for Victoria Export, testified, among other things, that Victoria Export ranks the largest of 10 to 15 Dutch manufacturers and exporters of regular sugar sweetened wafers and cookies, that he has been with the company for 15 years, 9 of which were spent as a director, that he is responsible for sales all over the world, and that at the time Mr. Adler arrived at the offices of Victoria Export and presented ingredients and a formula in connection with a discussion concerning the making of dietetic wafers by Victoria Export for plaintiff, "we did not even know what a dietetic biscuits were." (R. 38.)

And John Fleming, director of marketing sales for Weston Biscuit Co., and one-time president and owner of Delicia Sugar Wafer Co. of Bronx, N.Y., whom he characterized as being the largest sugar wafer manufacturer in the United States both in 1948 when he associated with the company and at the present time, gave testimony in this connection also. Mr. Fleming testified, among other things, that to his knowledge there were no imported dietetic wafers being marketed in the United States during fiscal year 1954, and that the first occasion for him to learn of the importation of dietetic wafers was the sale by plaintiff of products packed for it in Europe (R. 92–93).

Against this evidence adduced by plaintiff the only evidence adduced by defendant having any bearing on the importation into the United States of baked articles during the fiscal year 1954 was the concession defendant obtained from plaintiff at the trial that during fiscal year 1954 matzos (exhibit A) and wafer biscuits (exhibit B) were imported into the United States and appraised. Both exhibits A and B appear to be made without sugar and salt. However, neither

of these exhibits appears to the court, upon inspection and comparison with exhibits 2 and 3, to be like or similar to dietetic wafers. Hence, it is fair to say at this point that if dietetic wafers such as those at bar had been appraised in fiscal 1954 defendant would have come forth with evidence of such fact. And defendant's failure to do so is taken as an indication that dietetic wafers were not appraised in fiscal 1954.

It follows from the foregoing, and the court concludes, that the imported merchandise at bar is not specified on the "final list", and that therefore, said merchandise cannot properly be appraised in accordance with section 402a.

On the matter of export value under section 1401a(b) as contended for by plaintiff, the invoice among the official papers, dated March 25, 1965, indicates the price for the involved wafers, described as Estee Dietetic Holland Filled Wafers (both vanilla and chocolate flavored), to be $1.90 per box, and that the merchandise was sold to plaintiff on a c.i.f. New York basis. Plaintiff contends that this price, which is the price at which the merchandise was entered, is the proper dutiable export value, less invoiced ocean freight and marine insurance. Defendant contends, on the other hand, that plaintiff has failed to establish the claimed export value because it has not shown that such price fairly reflects the market value of the merchandise—presuming plaintiff to be a selected purchaser at wholesale.

On this phase of the issue the applicable new law provisions are 19 U.S.C.A., sections 1401a(b) and 1401a(f)(1)(B). Section 1401a (b) reads:

> (b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

And section 1401a(f)(1)(B) reads:

> (f) For the purposes of this section—
>
> (1) the term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
>
> \*  \*  \*  \*  \*  \*  \*
>
> (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

Both Mr. Adler and Mr. Bestebreurtje testified to facts relative to statements appearing on the invoice concerning the transaction at bar. Mr. Adler testified that the relationship between plaintiff and Victoria Company in Holland is that of buyer-seller (R. 17), that it was understood from the beginning of their business relationship that plaintiff would be the only customer for export to the United States of the dietetic wafers manufactured by Victoria (R. 18), and to the best of his knowledge Victoria has abided by this understanding (R. 18), that the price of $1.90 per box c.i.f. New York on the invoice herein is correct and was arrived at through free negotiations between plaintiff and Victoria, that it was the highest price acceptable to plaintiff, was not based on quantity purchased, included packing but did not involve any discounts or rebates and did not reflect any special consideration by Victoria for the use of the Estee brand name in Victoria's sales to countries other than the United States (R. 19–20), and that the course of dealings with respect to buying and selling between plaintiff and Victoria has remained consistent since the inception of their business relationship (R. 22). Mr. Adler also testified that Victoria placed no restrictions at any time on the disposition or use by plaintiff of the dietetic wafers (R. 20–21).

Mr. Bestebreurtje corroborated the foregoing testimony of Mr. Adler. In addition, Mr. Bestebreurtje testified that on or about the date of exportation of the involved merchandise, namely, March 26, 1965, that dietetic wafers were not being sold by Victoria for consumption in Holland, but were being sold, at c.i.f. prices, to customers in Norway and Sweden (R. 45). The witness produced invoices from the records of Victoria Export reflecting sales made by him to customers in Norway on February 25, 1965 (exhibit 4) and Sweden on January 20, 1965 (exhibit 5) of the same 5½-ounce size package of dietetic wafer covered by the invoice at bar (R. 66, 78). Referring to exhibit 4 the witness testified that this invoice reflected a c.i.f. price of 12½ Norwegian kroner per unit to Jensen which is equal to an f.o.b. Rotterdam price in United States dollars of $1.67½ per unit, somewhat lower than the f.o.b. price to plaintiff (R. 46, 49, 51). And referring to exhibit 5 the witness testified that this invoice reflected a c.i.f. price of 9.34 Swedish kroner per unit to Hollandska Kompaniet which is equal to an f.o.b. Rotterdam price in United States dollars of $1.75 per unit, the same as the f.o.b. price to plaintiff (R. 46, 53).

It was also brought out in the testimony of Mr. Bestebreurtje that the prices to customers in Norway and Sweden were based on the price to plaintiff because that was Victoria's way of knowing what plaintiff's item cost in production and what Victoria had to have for margin, which the witness said, was calculated to be five (5) percent profit before taxes (R. 42, 67). And Mr. Bestebreurtje also testified that the sales to plaintiff and to customers in Norway and Sweden were made in Dordrecht, Holland, the location of Victoria factory and Victoria Export, and the place where Victoria Export's sales normally are made (R. 54), and that it was not unusual at the time in question for Dutch manufacturers and exporters of sugar wafers and cookies to price their merchandise c.i.f. New York or other United States ports (R. 57–58).

There is other testimony in the record by these and other witnesses. But the foregoing constitutes the salient evidence and testimony bearing on the issue of export value under the new law formula.

The gist of defendant's argument against the existence of an export value for the involved merchandise as contended for herein by plaintiff is contained in the concluding paragraph on page 23 of defendant's brief. Here defendant states:

> We submit that plaintiff herein has failed to prove that its claimed value is equal to a price which fairly reflects the market value of the involved merchandise. When the weight of the same merchandise sold to a Norwegian purchaser was changed, the price for the merchandise increased, and that increase resulted in a substantially higher price than the price claimed to be the proper dutiable value herein. Plaintiff has not offered any proof to show the factors contributing to the differential, and no proof to show that these factors were not involved in sales for exportation to the United States. . . .

While the court agrees with the authorities referred to by defendant in support of the proposition that a plaintiff in a reappraisement proceeding under the new law export value formula must account for the differential in prices between the higher prices in the foreign market and the lower price contended for by such a plaintiff, the court does not find these authorities to be applicable to the facts of this case.

It is obvious that defendant believed that the Norwegian price to which the witness Bestebreurtje addressed himself was higher than the price to plaintiff, based upon a calculation made under the assumption that the Norwegian package was 4½ ounces in weight rather than 5½ ounces—resulting in a Norwegian price f.o.b. Rotterdam of $2.073 per box, United States dollars. If such were the state of facts revealed in this record then plaintiff would be put to its proof to explain away the differential in prices, assuming without deciding that mere weight differential would affect export value under the statutory criteria.

However, these are not the facts of record. The record shows that the 4½-ounce size package of dietetic wafers to which defendant has reference is the sample package received in evidence as illustrative exhibit 3. And with regard to this exhibit it was stipulated by counsel at the trial that it is the same as the imported merchandise except as to weight—the exhibit weighing 4½ ounces and the imported merchandise weighing 5½ ounces (R. 49). And it was clearly brought out on cross-examination of the witness Bestebreurtje by Government counsel that the package involved in the Norwegian sale was 5½ ounces (R. 78), at which point the subject of weight of package was dropped by counsel for the Government. Consequently, defendant is clearly in error in assuming that at the time in question the merchandise sold in the foreign markets weighed less than that sold to plaintiff. And the result is that the uncontradicted evidence of record establishes that the involved dietetic wafers were sold to plaintiff by the foreign manufacturer at a price which was equal to or higher than the price at which such manufacturer sold the merchandise to customers in other foreign countries at or about the same time. Under this state of facts no duty devolved upon plaintiff to explain away any price differential, as the price to plaintiff under these circumstances clearly reflects the market value of the merchandise.

Defendant advances no other objection to plaintiff's proofs under new law export value theory of valuation, and the court finds none. The court is satisfied that the evidence presented by plaintiff meets every criterion required by section 1401a(b) and establishes *prima facie* an export value thereunder for the involved dietetic wafers.

Therefore, the court finds as facts:

1. That the merchandise covered by the reappraisement appeal herein consists of dietetic wafers which were exported from Holland on or about March 26, 1965.

2. That said merchandise was appraised upon entry at $2.003 per box, net packed, on the basis of United States value as defined in 19 U.S.C.A., section 1402(e) (section 402a(e), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956).

3. That dietetic wafers were not appraised in the United States during the fiscal year of 1954.

4. That at or about the time of exportation of said merchandise, such merchandise was freely sold in the principal market of Holland for exportation to the United States in the usual wholesale quantities and in the ordinary course of trade and without restrictions of any kind to a selected purchaser at wholesale at a price of $1.90 per box packed, c.i.f. New York, inclusive of ocean freight and insurance charges as invoiced, which price fairly reflected the market value of

the merchandise. And on these facts the court concludes as matters of law:

1. That said merchandise is not specified on the final list promulgated by the Secretary of the Treasury in 93 Treas. Dec. 14, T.D. 54521.

2. That export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) is the proper basis for determination of the value of said merchandise.

3. That such export value is $1.90 per box less the proportionate share of the invoiced non-dutiable charges for sea freight and marine insurance.

Judgment will be entered herein accordingly.